```
                                                    USDC SDNY
UNITED STATES DISTRICT COURT                        DOCUMENT
SOUTHERN DISTRICT OF NEW YORK                       ELECTRONICALLY FILED
---------------------------------------------------------------- X   DOC #: _____
                                                :    DATE FILED: 11/9/2022
JUNIOR GRIFFIN,                                 :
                                                :
                         Movant,                :        1:21-cv-5822-GHW
                                                :        1:16-cr-656-15-GHW
           -against-                            :
                                                :
UNITED STATES OF AMERICA,                       :    MEMORANDUM OPINION &
                                                :            ORDER
                         Respondent.            :
                                                :
---------------------------------------------------------------- X
```

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

     In March 2018, Junior Griffin was convicted of conspiracy to distribute crack cocaine.  The jury found that he was responsible for the distribution of so much crack and cocaine that the Court was required to impose a mandatory minimum 10-year sentence.  At sentencing, Mr. Griffin passionately protested his innocence.  The Court imposed the mandatory minimum sentence required by law.

     In support of this petition for *habeas* relief from his sentence, Mr. Griffin claims that his counsel failed to convey a plea agreement offered by the Government.  And he disclaims his prior protestations of innocence, asserting that he would have accepted the Government's plea offer had it been conveyed.

     The Court has reviewed the parties' submissions and heard testimony during an evidentiary hearing held on October 24, 2022.  Because the Court finds that Mr. Griffin's petition is based on false assertions of fact, and that his counsel properly conveyed to him the proposed plea agreement offered by the Government, Mr. Griffin's petition to vacate his sentence is denied.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    The Indictment, Trial, and Appeal

On September 29, 2016, Mr. Griffin and 22 others were indicted and charged with conspiring to distribute, and possessing with the intent to distribute, marijuana, oxycodone in the form of Percocet tablets, and mixtures of substances containing crack, heroin, and cocaine.  Dkt. No. 1.[1]  Because of the quantity of narcotics at issue, the conspiracy charged against Mr. Griffin bore a mandatory minimum sentence of 10 years of imprisonment.  Mr. Griffin was arrested on October 5, 2016.  *See* Dkt. No. 31.  On the same day, Anthony Cecutti, a member of the Court's Criminal Justice Act ("CJA") panel, was appointed to represent Mr. Griffin.  *Id.*  Mr. Griffin was released the same day on bail.  *Id.*

The multi-defendant case wended its way through discovery and toward trial.  On July 10, 2017, the Court entered an order scheduling trial for March 5, 2018.  Dkt. No. 219.  Over the course of the following months as trial approached, nearly all of the defendants pleaded guilty, including Jonathan Perez, who was charged as one of the leaders of the conspiracy.  Mr. Perez pleaded guilty in August 2017, and was sentenced to 223 months imprisonment in November of that year.  Dkt. Nos. 268; 403.  By February 23, 2018, Mr. Griffin was the only defendant remaining for trial.  The Court appointed a second lawyer, Jennifer Louis-Jeune, in addition to Mr. Cecutti to represent Mr. Griffin.  Dkt. No. 440.

On February 23, 2018, a superseding indictment was filed, adding charges against Mr. Griffin.  Dkt. No. 490.  In addition to the drug conspiracy charge with which he had been charged from the outset of the case, the superseding indictment charged Mr. Griffin with two new counts: one for distributing cocaine and another for distributing marijuana.  The Government later chose not to pursue the marijuana distribution charge at trial.  The parties selected a jury on March 5, 2018,

---

[1] All citations to the docket refer to criminal case unless otherwise noted.

but the trial did not begin until a week later, on March 12, 2018.  The Court delayed the start of trial

to provide Mr. Griffin additional time to prepare to meet the new charges added in the superseding

indictment.

Trial lasted exactly five days.  On March 16, 2018, the jury found Mr. Griffin guilty of both

of the charged offenses.  The jury found that Mr. Griffin had participated in the charged narcotics

conspiracy and that the conspiracy involved 280 grams or more of crack cocaine and 500 grams or

more of cocaine.  Dkt. No. 534.  Mr. Griffin was also found guilty for the distribution of cocaine.

*Id.*  On the day that the jury returned its verdict, the Court remanded Mr. Griffin to the custody of

the United States Marshals Service:  he had been at liberty until then.

On October 1, 2018, Mr. Cecutti wrote the Court to request that the Court hold a

substitution of counsel proceeding.  Dkt. No. 600.  In the letter, Mr. Cecutti wrote that "[d]espite all

our efforts, our relationship with Mr. Griffin has entirely broken down and we have reached a

complete impasse in our representation of him.  Based also on the significant punishment he is

facing, along with the serious collateral consequences, namely mandatory deportation, we urge the

Court to appoint new counsel."  *Id.*  On October 10, 2018, the Court relieved Mr. Cecutti and Ms.

Louis-Jeune as counsel for Mr. Griffin and appointed James E. Neuman to represent him.  Dkt. No.

605.

The Court sentenced Mr. Griffin on January 8, 2019.  Dkt. No. 613.  The Court principally

sentenced Mr. Griffin to 120 months for each of his two offenses, to be served concurrently.  *Id.*  A

120-month sentence was the mandatory minimum sentence with respect to the charged drug

conspiracy offense.

Mr. Griffin filed a notice of appeal on January 17, 2019.  Dkt. No. 616.  The Second Circuit

Court of Appeals affirmed his conviction by summary order on April 30, 2020.  *United States v.*

*Griffin*, 811 F. App'x 683, 685 (2d Cir. 2020), *cert. denied*, 208 L. Ed. 2d 121, 141 S. Ct. 419 (2020), and

*cert. denied*, 208 L. Ed. 2d 409, 141 S. Ct. 834 (2020).  As indicated by the citation, the Supreme Court

denied *certiorari* twice, the last denial was issued on November 9, 2020.

###### B.     The *Habeas* Petition

Mr. Griffin filed a motion to vacate his sentence under 28 U.S.C. § 2255 timely on July 1,

2021 (the "Petition").  Dkt. No. 888.  Mr. Griffin prepared his Petition *pro se*.  Mr. Griffin's Petition

raised a single argument as a basis to overturn his conviction and sentence:  Mr. Griffin asserted that

his counsel had failed to provide him advice regarding a plea offer by the Government.  Mr. Griffin

asserted that "Attorney Cecutti did not offer any advice to Griffin vis-a-vis the government's

affirmative offer to seek leniency on his behalf in exchange for his cooperation."  Petition at 1.

According to Mr. Griffin, Mr. Cecutti knew "that if Griffin cooperated the government's submittal

of a motion to depart below the statutory 10 year mandatory-minimum pursuant [to] 18 U.S.C.

§ 3553(e) would give this Court discretion to apply a reduced advisory guidelines sentence pursuant

to the government's proffered 5K1.1 letter."  *Id.* at 1-2.  According to Mr. Griffin, Mr. Cecutti

"offered Griffin zero advice about the government's proposed cooperation/plea offer."  *Id.* at 2.

That failure, according to Mr. Griffin, prejudiced him because he would have accepted the offer and

cooperated had he known that he could do so.  Mr. Griffin asserted the following in his Petition:

> Consider, Griffin swears he was willing and able to cooperate in the manner
> proffered by the government and that he, in fact, would have had Cecutti offered
> him 'any advice at all about the government's proposed cooperation/plea
> deal[.]' . . . .  Had Cecutti provided Griffin the advice about the cooperation deal that
> he implored him to, Griffin would have cooperated and thus been saved from the
> government's later discovery of a witness willing to cooperate in securing a
> superseding indictment charging the additional substantive charge and testify against
> Griffin at trial; likewise had Cecutti offered Griffin any advice at all about the
> cooperation/plea deal[,] Griffin would have pled guilty and thus not been convicted
> at trial -- most significantly, he would have received the benefit off the government's
> proffered 18 U.S.C. § 3553(e) motion and thereby received a sentence below the 10
> year statutory mandatory-minimum under an advisory guideline set by the
> government's proffered U.S.S.G. § 5K1.1 letter.  In short, had Cecutti offered
> Griffin any advice about the proffered deal, he would not have incurred [a]
> conviction under the superseding indictment and he would have suffered far less
> imprisonment than the 10 year mandatory sentence imposed upon him.

Petition at 3.

Mr. Griffin supported his Petition with a sworn affidavit outlining the factual basis for his application.  Affidavit of Junior Griffin, Dkt. No. 888 ("Griffin Aff.").  In it, Mr. Griffin describes a meeting with the Government that took place approximately six months after his arrest in August 2016—around April 2017.

> Attorney Cecutti directed me to meet him at his law office.  Upon arriving at Attorney Cecutti's law office, he advised we were going to meet with the government to "see what they have to say."  Attorney Cecutti and I went to the United States Attorney's Office for the Southern District of New York (USAOSDNY) and met with an AUSA and several law enforcement agents.  The AUSA told me she would provide me with a letter in support of a downward departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3353(e) if I cooperated with the USAOSDNY's investigation of other individuals involved in its loosely-charged narcotics conspiracy.

Griffin Aff. ¶ 2.

In Mr. Griffin's account, Mr. Cecutti did not advise him at all "on whether to accept, or reject, the AUSA's cooperation/plea offer."  *Id.* ¶ 3.  "I repeatedly asked Attorney Cecutti for advice on the government's proffered cooperation/plea deal.  Attorney Cecutti refused to discuss the government's proposed cooperation/plea deal with me."  *Id.*

After the government filed its superseding indictment, Mr. Griffin asserts, he "again asked Attorney Cecutti about the government's proffered cooperation/plea deal."  ¶ 4.  Again, according to Mr. Griffin, Mr. Cecutti failed to advise him about the plea deal.  Instead, "Attorney Cecutti continued to shun any discussion about the government's proposed cooperation/plea deal."  *Id.*  Mr. Griffin asserts that Mr. Cecutti's failure to advise him regarding the Government's proposed plea deal stemmed from his hubris.  Mr. Griffin asserts that Mr. Cecutti hold him that "[he] ha[s] been to trial with this prosecutor before and [he] know[s] [he] can win this trial."  *Id.*  Because Mr. Cecutti was confident in his ability to win at trial, Mr. Griffin asserts, Mr. Cecutti advised Mr. Griffin to proceed to trial.

Mr. Griffin affirms that he would have cooperated against his co-defendants and accepted a plea offer, if he had been advised about the opportunity to do so.  "Had Attorney Cecutti offered me any advice at all about the government's proposed cooperation/plea deal[,] I would have cooperated and pleaded guilty.  I was willing and able to cooperate in the manner proffered by the government.  But for Attorney Cecutti's absolute unwillingness to discuss the government's proffered cooperation/plea deal with me, I would have cooperated and pled guilty."  *Id.* ¶ 5.

### C.   The Government's Opposition

After reviewing the Petition and Mr. Griffin's affidavit, the Court ordered that the Government answer the Petition.  Dkt. No. 889.  The Government's opposition was filed on April 11, 2022 (the "Opposition").  Dkt. No. 950.  The Government attached to its Opposition an affidavit by Mr. Cecutti, who had been authorized by Mr. Griffin to disclose the content of their communications.  In its Opposition, the Government conceded that an evidentiary hearing would be necessary to resolve a factual issue at the heart of Mr. Griffin's petition.  That was because Mr. Cecutti's account of events varied profoundly from that presented by Mr. Griffin.

In Mr. Cecutti's affidavit, he asserted that he had reviewed the single plea offer from the Government with Mr. Griffin.  Affidavit of Anthony Cecutti, Dkt. No. 950-1 ("Cecutti Aff."), at ¶ 5.  In his declaration, Mr. Cecutti affirmed that sometime after April 12, 2022, he "reviewed the agreement with Mr. Griffin and informed him that the Sentencing Guidelines were 87 to 108 months' imprisonment and that he was not subject to any mandatory minimum sentence.  I also informed him that by pleading guilty, his conviction made it very likely that his deportation was presumptively mandatory.  Mr. Griffin rejected the offer."  *Id.*

Mr. Cecutti asserted that on April 24, 2017, following Mr. Griffin's review of the plea agreement, he and Mr. Griffin met with representatives of the Government for a so-called "reverse proffer."  Mr. Cecutti stated that he believed that participation in the reverse proffer "would be

beneficial to Mr. Griffin so that he could best understand his options, specifically, whether to plead guilty pursuant to the terms of the agreement, try to cooperate or go to trial." *Id.* ¶ 6. Mr. Cecutti's affidavit reviewed some of the evidence presented to Mr. Griffin during the session, and, finally, the options presented to him by the Government: the prosecutor informed Mr. Griffin "that he had three options: Mr. Griffin could go to trial and that if he did, she said that 'we will prove you guilty' and 'you will go to prison and be deported;' Mr. Griffin could plead guilty pursuant to the previously disclosed terms; or, Mr. Griffin could try and cooperate." *Id.* ¶ 7.

Mr. Cecutti affirmed that he discussed the plea agreement and cooperation with Mr. Griffin multiple times. *Id.* ¶¶ 8, 9. But, according to Mr. Cecutti, Mr. Griffin "flatly rejected the plea agreement and did so multiple times in several meetings I had with him." *Id.* ¶ 8. According to Mr. Cecutti, Mr. Griffin also refused to cooperate. Instead, Mr. Griffin "maintained his innocence throughout." *Id.* ¶ 10. "This left trial as the only way to resolve the case." *Id.*

According to Mr. Cecutti, he undertook efforts to mitigate the effects of Mr. Griffin's conviction after trial "by trying to discuss the benefits of the safety valve and possible immigration relief." *Id.* ¶ 10. In order to obtain the benefit of the safety valve—which would permit the Court to sentence Mr. Griffin to a sentence below the mandatory minimum sentence—Mr. Griffin would have to proffer with the Government regarding his role in the offense. But "Mr. Griffin simply refused to do so." *Id.*

### D.    The Court Appoints Counsel

In light of the factual dispute revealed by Mr. Griffin and Mr. Cecutti's dueling affidavits, the Court appointed Randa D. Maher to represent Mr. Griffin in connection with his Petition. Dkt. No. 954. The Court granted Ms. Maher leave to research Mr. Griffin's claim and to file additional claims in support of his *habeas* petition. Dkt. No. 958. The Court scheduled briefing with respect to any supplemental submissions that Mr. Griffin wished to pursue through counsel. *Id.* And the Court

extended that deadline at the request of Mr. Griffin's counsel.  Dkt. No. 966.

On August 11, 2022, the Court held a conference to discuss an application by Ms. Maher to withdraw as counsel for Mr. Griffin.  The Court appointed standby counsel to provide independent advice to Mr. Griffin in connection with the issues raised by Ms. Maher.  Ultimately, however, Mr. Griffin chose to proceed with Ms. Maher as his counsel and Ms. Maher elected not to pursue any claims other than the one raised in the original Petition.  Dkt. No. 977.  Nonetheless, the Court granted Mr. Griffin leave to file any additional claims for *habeas* relief *pro se* if he wished.  *Id.*  Mr. Griffin did not do so.  As a result, the only issue presented to the Court for resolution was the one raised by the original Petition:  was Mr. Cecutti ineffective as a result of his failure to review the terms of a plea and cooperation deal with Mr. Griffin?

### E.    The Evidentiary Hearing

The Court scheduled an evidentiary hearing for October 24, 2022 to answer that question. Mr. Griffin testified at the hearing.  His long-time partner, Yolanda Gonzalez, also testified.  Mr. Cecutti testified at the request of the Government.  The Court has evaluated the evidence presented by the parties at the evidentiary hearing, which form the basis for the following findings of fact.

### III.    FINDINGS OF FACT

### A.    Findings of Fact

Mr. Cecutti provided credible testimony regarding his work with Mr. Griffin and the nature of the advice that Mr. Cecutti provided to Mr. Griffin.  The Court largely accepts his testimony as true.  Mr. Griffin's testimony, by contrast, was not credible:  his testimony was shifting, evasive, self-motivated, and fundamentally unworthy of belief.  As a result, the Court concludes that, as a matter of fact, Mr. Cecutti provided ample advice to Mr. Griffin regarding the terms of the Government's plea offer, and that, contrary to Mr. Griffin's self-serving assertions in his affidavit and at the

hearing, Mr. Griffin continuously maintained his innocence, and, as a result, consistently rejected the offers and opportunities to resolve the case short of trial presented to him by Mr. Cecutti.

Mr. Cecutti is an experienced criminal defense lawyer. He has practiced in that area for approximately 17 years and has represented over a thousand defendants in that time. He has tried over 40 cases. He has been a member of the CJA panel of this court since 2014. To become a member of the Court's CJA panel, an attorney must have demonstrated substantial experience in all aspects of criminal defense work, including trial.

As part of his practice, Mr. Cecutti works hard to develop a trusting relationship with his clients. To do so, he stays in regular contact with his clients, through meetings, calls, text messages and the like—all to develop his relationship with the client and to demonstrate his care and concern for his clients. Mr. Cecutti's interactions with Mr. Griffin followed that pattern from the commencement of his representation of him at the outset of the case. From the date of his appointment, when he first exchanged his contact information with Mr. Griffin, Mr. Cecutti maintained regular contact with his client.

Mr. Cecutti met with Mr. Griffin in person many times over the course of his representation—more than 30, according to Mr. Griffin. Mr. Cecutti also spoke with Mr. Griffin many times by phone. Occasionally, Ms. Gonzalez, Mr. Griffin's partner, accompanied him to meetings with Mr. Cecutti. After her appointment, co-counsel, Ms. Louis-Jeune, would join in meetings between Mr. Cecutti and Mr. Griffin. Mr. Cecutti also retained a Spanish-speaking investigator to aid in the development of the case.

Mr. Cecutti communicated with Mr. Griffin in English. He did so because he correctly understood that Mr. Griffin had a strong command of the English language. During the course of his years of practice as a criminal defense lawyer, Mr. Cecutti has worked with interpreters when working with clients who do not speak English, or who have difficulty understanding English. Mr.

Cecutti did not use the services of an interpreter when working with Mr. Griffin because, based on his interactions with him, Mr. Cecutti correctly concluded that Mr. Griffin had a strong command of the English language, and that an interpreter was not necessary in order for him to communicate fully with him.

On April 24, 2017, Mr. Cecutti and Mr. Griffin attended a "reverse proffer" session with counsel for the United States. One of the Assistant United States Attorneys prosecuting the case invited them to participate in the session, which provides an opportunity for the Government to lay out the evidence that it has against a defendant in order to persuade him to accept a plea agreement in lieu of trial. Mr. Cecutti believed that a reverse proffer would be very helpful for Mr. Griffin, as an opportunity to learn what the evidence was against him and to evaluate his options. Mr. Cecutti explained to Mr. Griffin that he did not need to speak at the session: he could just listen and learn.

The reverse proffer session was attended by an Assistant United States Attorney as well as an agent, and a Spanish-language interpreter, who Mr. Cecutti had requested be present in an excess of caution. During the reverse proffer session, an Assistant United States Attorney laid out the evidence against Mr. Griffin. She said that in order to get a conviction, she would "only need to press play"—referring intercepted phone calls between Mr. Griffin and Mr. Perez, the gang's ringleader. The Assistant United States Attorney also described other evidence against Mr. Griffin, including cooperating witnesses.

The last section of the reverse proffer session focused on the options that the Government saw as available for Mr. Griffin. There were three: plead guilty, cooperate, or go to trial. Mr. Cecutti understood that the Government was seeking Mr. Griffin's cooperation in making a case against his co-defendant, Mr. Perez. While the Government did not say so much during the proffer session, Mr. Cecutti reasonably concluded that was the case, based on the recorded conversations between Mr. Griffin and Mr. Perez, and because he viewed Mr. Griffin as the kind of mid-tier

conspirator who would be useful in developing a case against the felon at the top of the pyramid, here Mr. Perez.

The reverse proffer session was relatively lengthy. It lasted significantly longer than the five minutes that Mr. Griffin testified to during the hearing. There was simply too much content to take place in such a limited window. Mr. Cecutti's recollections of the content of the reverse proffer session were credible, and were supported by his contemporaneous written notes of the session.

After the reverse proffer session, Mr. Cecutti and Mr. Griffin traveled back to Mr. Cecutti's office. They discussed Mr. Griffin's options. Mr. Griffin did not indicate to Mr. Cecutti that he had any interest in accepting the Government's offer to cooperate. To the contrary, as the Court will describe in more depth momentarily, Mr. Griffin consistently maintained his innocence.

Shortly after the reverse proffer session, in mid-May 2017, Mr. Cecutti received a proposed plea offer from the United States.[2] The May 15, 2017 transmittal letter stated that the Government's proposed plea agreement was enclosed "which constitutes a plea offer that you should communicate with your client." The cover letter gave Mr. Griffin a short window in which to accept the proposed agreement.

The proposed plea agreement took the form of a letter dated April 12, 2017 to Mr. Cecutti (the "Plea Agreement"). The Plea Agreement was signed by one of the Assistant United States Attorneys assigned to the case and her supervisor. The Plea Agreement offered Mr. Griffin the opportunity to enter into a "(b)(1)(C)" deal, which Mr. Cecutti viewed as favorable. As described

---

[2] In his affidavit, Mr. Cecutti affirmed that "[b]ased on a review of my notes, the Government made a plea offer to Mr. Griffin on April 12, 2017." Cecutti Aff. ¶ 5. Based on the other evidence presented during the hearing, the Court finds this statement regarding the date on which the plea offer was extended to be incorrect. The plea agreement was dated April 12, 2017—explaining why Mr. Cecutti's review of his notes would lead him to believe that the plea was communicated on that date. But while the plea letter from was dated April 12, 2017, the plea agreement was conveyed to Mr. Cecutti—and, thence, to Mr. Griffin—under cover of a transmittal letter from an Assistant United States Attorney to Mr. Cecutti dated May 15, 2017. The Court finds that there was a single plea agreement offered to Mr. Griffin and that it was embodied in letter dated April 12, 2017. However, the letter was not transmitted to Mr. Cecutti and Mr. Griffin until just over a month after its date.

above, Mr. Griffin had been charged with participating in a conspiracy to distribute a substantial amount of cocaine and crack—an amount sufficient to trigger a 10 year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A). Under the terms of the proposed Plea Agreement, however, the Government would "accept a guilty plea to the lesser included offense of conspiracy to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of cocaine base, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C)." As the proposed Plea Agreement stated, that crime bore a 20 year maximum sentence, a maximum lifetime term of supervised release, and a mandatory minimum term of three years of supervised release. But unlike the charged offense, it did not require that Mr. Griffin serve a mandatory minimum of 10 years in prison.[3]

The Plea Agreement contained a calculation of the advisory sentencing guidelines range that would apply to the offense, upon which Mr. Griffin would have to agree. The calculation was predicated upon Mr. Griffin's acceptance of responsibility for an offense "that involved at least 840 grams but less than 2.8 kilograms of cocaine base . . . ." With that amount of cocaine base as the predicate, the stipulated guidelines range was calculated to be 87 to 108 months imprisonment. Under the Plea Agreement, both parties retained the right to argue for a "variance"—that is a sentence outside of the advisory range—based on the Court's assessment of the factors set forth in 18 U.S.C. § 3553(a). And, theoretically—given that there would be no mandatory minimum sentence for the offense to which Mr. Griffin was being offered the opportunity to plead guilty—the Court could impose a sentence that was substantially below the advisory guidelines range.

By accepting the Plea Agreement, Mr. Griffin was asked to waive a number of rights to appeal or otherwise challenge his conviction and sentence. Among other things, Mr. Griffin would

---

[3] The Plea Agreement did not provide for Mr. Griffin to cooperate with the Government. It did not offer a 5K1.1 letter at sentencing. It did, however, permit Mr. Griffin to argue for relief from the mandatory minimum sentence of three years of supervised release pursuant to the so-called "safety valve" statute at 18 U.S.C. § 3553(f).

have been required to agree not to challenge any sentence within or below the stipulated guidelines range of 87 to 108 months imprisonment. He would also have agreed not to challenge "any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction."

After he received the Plea Agreement, Mr. Cecutti met with Mr. Griffin in person to discuss it. He had a copy of the Plea Agreement with him when he did so. Mr. Cecutti told Mr. Griffin that the Government had made a plea offer and that he was obligated to tell Mr. Griffin what the offer was. When Mr. Cecutti told Mr. Griffin what the offer was, Mr. Griffin immediately laughed. Mr. Griffin told Mr. Cecutti that there was no way that he was ever going to plead guilty. Mr. Griffin persistently maintained his innocence. Mr. Griffin took the position that the prosecution, and the offer, which required that he accept responsibility for a crime that he did not commit, were unfair.

Nonetheless, Mr. Cecutti walked Mr. Griffin through all of the principal terms of the Plea Agreement. He explained the nature of the offense that the Government was asking him to accept responsibility for: as described above, that was for engaging in a conspiracy to traffic in cocaine. Mr. Cecutti told Mr. Griffin that to accept the plea offer, he would have to admit that he participated in the drug conspiracy charged in the indictment. Mr. Cecutti explained the guidelines range applicable to the offense, as outlined in the Plea Agreement. And Mr. Cecutti informed Mr. Griffin that and that the crime to which he would be pleading guilty did not bear a mandatory minimum sentence.

Mr. Cecutti was also focused on the potential immigration consequence of the proposed plea. He informed Mr. Griffin that if he accepted the plea, he would be subject to mandatory deportation because Mr. Griffin was not a citizen, and the crime was one that mandated deportation.

Throughout the process of reviewing the Plea Agreement, as throughout the course of Mr. Cecutti's representation of Mr. Griffin, Mr. Griffin asserted that he was innocent and refused to

accept any proposed offer.

Mr. Cecutti did not talk with Mr. Griffin about the prospect of cooperating with the Government, either during his review of the Plea Agreement with him or later. Mr. Cecutti made a reasonable decision not to do so, based on the information provided to him by Mr. Griffin. Mr. Griffin consistently asserted that he was innocent. And he never indicted to Mr. Cecutti or other members of Mr. Cecutti's team that he had any information about others that he could provide to the Government were he to cooperate. Because Mr. Griffin had clearly expressed that there was no set of circumstances in which he would plead guilty, Mr. Cecutti reasonably concluded that it was not worthwhile to push the option on Mr. Griffin. Mr. Cecutti credibly summarized his views during the hearing, as follows:

> I didn't talk with him about cooperation because in order to cooperate in this district, you have to admit responsibility for what you're charged with. He was nowhere in that universe. And the other issue was, as assigned counsel and the need to build a trusted relationship, based upon my experience, pressing somebody with cooperation who is persisting in their innocence is not a wise move. It's not productive in terms of building a trusted relationship.

Tr. at 165:13-19.

It was a reasonable decision for Mr. Cecutti not to press cooperation on Mr. Griffin under the circumstances: Mr. Griffin had rejected the possibility of accepting responsibility for the charged offense, which was a necessary pre-condition for a deal involving his cooperation. And Mr. Cecutti did not want to undermine the trusting relationship that he reasonably concluded was important to his successful continued representation of Mr. Griffin.[4]

Because Mr. Griffin expressly rejected the Government's plea offer, and consistently maintained his innocence, Mr. Cecutti reasonably concluded that there was no reasonable option for

---

[4] Mr. Cecutti and his team also worked toward an application for a deferred prosecution agreement for Mr. Griffin. This effort also foundered because one of the assigned Assistant United States Attorneys told Mr. Cecutti that Mr. Griffin would be required to accept responsibility for his criminal conduct--a course that Mr. Griffin rejected.

Mr. Griffin other than trial.  So Mr. Cecutti took reasonable steps to prepare for trial:  he requested

the appointment of an associate counsel, Ms. Louis-Jeune, and a Spanish-speaking investigator.  The

defense team reviewed all of the discovery, and prepared appropriate pre-trial motions, including

motions *in limine*.  Throughout the process, Mr. Cecutti remained in close contact with Mr. Griffin.

In the run-up to trial, the Government obtained the superseding indictment described

above.  It added a charge for a sale of cocaine to the indictment.  From Mr. Cecutti's perspective,

the new charge "changed the landscape of the case completely."  Tr. at 132:4-5.  The new charge

was based in part on text messages that Mr. Griffin had exchanged with a man who had bought

cocaine from him.  In the view of Mr. Cecutti and his team, "those text messages were awful . .

because they showed what . . . they thought to be clear cut conversations about narcotics activity

between him and another individual."  *Id.* at 132: 10-13.

Mr. Cecutti and Ms. Louis-Jeune explained to Mr. Griffin their concerns about the text

messages.  They asked another lawyer to help them conduct a mock cross-examination of Mr.

Griffin to explore how he would testify about them and the other evidence at trial, searching for a

credible explanation that could be presented as a defense.  Mr. Griffin's legal team concluded that

Mr. Griffin's explanation for his messages was "terrible."  Tr. at 133:19.  The team explained their

view of the evidence and Mr. Griffin's explanation to Mr. Griffin, and advised him not to testify at

trial because they thought that his responses were not credible.  Notwithstanding his counsel's

communications to him about the damning nature of his text communications, and the incredible

nature of his explanations for them, Mr. Griffin continued to maintain his innocence of all of the

charged offenses.

Heading into trial, Mr. Cecutti and his team were not optimistic about Mr. Griffin's

prospects for a victory at trial.  As an experienced defense attorney, Mr. Cecutti knew that "[a]ny

time that you are trying a case in the Southern District, it is going to be very difficult to be

successful." *Id.* at 134:8-10.  And with the addition of the new charge against Mr. Griffin in the

superseding indictment, Mr. Cecutti believed that Mr. Griffin's prospects for victory had diminished

still further.  Mr. Cecutti did not represent to Mr. Griffin that he was confident that he would win at

trial.  To the contrary, through his mock cross-examination of Mr. Griffin and other

communications with Mr. Griffin, Mr. Cecutti conveyed his skepticism regarding Mr. Griffin's

ability to mount a successful defense.

The Government did not present another opportunity for Mr. Griffin to plead guilty in the

run-up to the trial.  Mr. Griffin never indicated a change of heart and an interest in pursuing a plea

deal.  He continued to assert his innocence.  And by the time that Mr. Griffin's trial commenced, he

was the only defendant remaining in the case:  Mr. Perez, who Mr. Cecutti thought might be the

target of the Government's earlier suggestion of cooperation, had pleaded guilty long before.

After trial, the jury did not take long to reach its guilty verdict:  guilty on both counts.[5]  The

Court remanded Mr. Griffin to the custody of the marshals that day.  Mr. Cecutti and Ms. Louis-

Jeune immediately went to the local federal jail to talk with Mr. Griffin about next steps.  They

travelled to meet with Mr. Griffin's family members as well.  Mr. Cecutti was focused on damage

control as a result of the conviction.  He was particularly focused on opportunities to help Mr.

Griffin avoid the mandatory minimum sentence for his drug conspiracy offense.  Mr. Cecutti

explained to Mr. Griffin about the availability of the safety valve statute.  He thought that if Mr.

Griffin could come around to the possibility of accepting some form of responsibility, he could

make a proffer to the United States and be able to take advantage of the relief afforded by the safety

valve from the minimum sentence otherwise mandated by his conviction.

Mr. Cecutti conveyed the safety valve opportunity to Mr. Griffin.  Mr. Griffin rejected it

---

[5] As an aside, after the verdict was announced, the courtroom, which was full of Mr. Griffin's supporters, erupted as a result of their disappointment in the verdict.

because taking advantage of the safety valve would require that he admit responsibility. For Mr. Griffin, that was a non-starter: even after the trial, he persisted in his assertions of his innocence.

Mr. Cecutti and Ms. Louis-Jeune also did a lot of work to try to advise Mr. Griffin about ways to mitigate the immigration consequences of his conviction. They provided information about those issues to both Mr. Griffin and his wife.

But after his conviction, Mr. Griffin's relationship with Mr. Cecutti deteriorated. Mr. Griffin, imprisoned in a federal facility, was struggling. He was paranoid, and feared that Mr. Cecutti was working for the Government. Ultimately, the relationship deteriorated to the point that Mr. Cecutti and Ms. Louis-Jeune could not continue to represent Mr. Griffin. As a result, as described above, the Court appointed replacement counsel before sentencing.

## A.   Mr. Griffin Lied—A Lot—In His Affidavit and at the Hearing

The preceding section sets forth the Court's principal findings of fact. As described, the Court credited the testimony of Mr. Cecutti entirely in reaching those findings, with the exception of his original statement regarding the date on which he received and reviewed the Plea Agreement with Mr. Griffin. The Court found Mr. Griffin's factual statements not to be worthy of belief. The Court reached the conclusion that Mr. Griffin was not credible based on its assessment of all of the evidence presented to it, including the Court's assessment of the witnesses' demeanor on the stand. Without limiting the scope of the evidence considered by the Court to reach the conclusion that Mr. Griffin's account was unworthy of belief, a few paragraphs to highlight some of the issues with Mr. Griffin's testimony are warranted.

At the outset, Mr. Griffin had every motivation to lie. He hoped to obtain relief from his substantial prison sentence. He also hoped to avoid deportation. Mr. Griffin has lived in the United States for over 30 years, since he was a minor. He has a long-term partner in the United States— Ms. Rodriguez—and children, all of whom are citizens of the United States. Mr. Griffin built a

relatively successful life in this country, albeit one funded in part with the proceeds of his sales of narcotics.  He does not want to be deported and be separated from his life in this country.  All of that provides substantial motivation for Mr. Griffin to lie, as he did, in his affidavit and at the evidentiary hearing.

At the evidentiary hearing, Mr. Griffin presented an argument and evidence designed to persuade the Court that he was not able to understand his counsel and the advice being provided to him, or the content of important documents.  This was an argument that was not presented in Mr. Griffin's Petition and, as the Court will discuss, is undermined by the affidavit presented in support of it.  The Court finds that Mr. Griffin misrepresented his purported inability to speak English and understand in order to support his *habeas* petition after he was appointed counsel in the case.  This conclusion is supported by the Court's review of all of the evidence, including its appraisal of things that do not show up on the transcript, such as the fact that Mr. Griffin's body language showed that he understood English questions posed to him before the interpreter working at the evidentiary hearing had completed their translation of the question.

A few details from Mr. Griffin's personal history and the record of this case provide context for the Court's determination that Mr. Cecutti reasonably concluded that Mr. Griffin had a strong command of English, and that Mr. Griffin's late-rising contention that English was an issue in Mr. Cecutti's representation was a post-hoc fabrication.  First, Mr. Griffin moved to the United States from the Dominican Republic in 1992—over thirty years ago today, and over 25 years before his arrest.  Mr. Griffin was a minor when he arrived in this country.  Mr. Griffin asserts that his father was a citizen when Mr. Griffin arrived here.  Mr. Griffin attended high school in the United States. He enrolled in a college in the United States, where classes were taught in English.  His long-term partner, Ms. Rodriguez, speaks both Spanish and English—as do his children.  Ms. Rodriguez testified that "if I'm around . . . he speaks both English and Spanish."  Tr. at 101:3-4.

Mr. Griffin used English regularly while working at his job at an appliance shop.  He also spoke English regularly in his work as a drug dealer.  During the evidentiary hearing, the Government introduced a recording of a phone conversation in which Mr. Griffin spoke with his co-defendant, Mr. Perez (who also spoke Spanish), in English, not Spanish.

One significant piece of evidence that proves that Mr. Griffin's testimony that he was unable to understand the English language when Mr. Cecutti communicated with him is the very affidavit presented by Mr. Griffin in support of the Petition.  During the evidentiary hearing, in his effort to present how his inability to understand English presented a barrier to his understanding of his lawyer's advice and what was happening around him, Mr. Griffin described his view of what happened during his reverse proffer session with the United States.  During the hearing, Mr. Griffin described the meeting as follows:

> Q:  How long did the meeting last?
> A:  About five minutes.
> Q:  Do you recall what was discussed?
> A:  That the person who was talking to me knew me.  He said that he could give a letter to his boss, that their boss could talk to another boss.  And then Anthony jumped up and said, "so you want my client to cooperate," because I could not understand everything that they were talking to me about. . . .
> Q:  What happened . . . after you heard Mr. Cecutti say "you want my client to cooperate?
> A:  That – he said that "my client was not going to cooperate," so we got up and left.

Tr. at 21:14-22:17.  Crediting Mr. Griffin's testimony, one would believe that because of his limited understanding of English, he did not understand the gist of the proffer session:  He understood merely that the prosecutor could "give a letter to his boss."  But the Court does not credit his testimony.  It is belied by other evidence.

In his affidavit in support of his Petition, Mr. Griffin revealed that he understood the content of the proffer session in a much more nuanced manner:  "The AUSA told me she would provide me with a letter in support of a downward departure pursuant to U.S.S.G. § 5K1.1 and 18

19

U.S.C. § 3553(e) if I cooperated with the USAOSDNY's investigation of other individuals involved in its loosely-charged narcotics conspiracy."  Griffin Aff. ¶ 2.

The affidavit was crafted before Mr. Griffin had counsel, and before he seized on the strategy to present his asserted inability to understand English as a basis for his claim.  It makes plain that he understood the content of the proffer with a degree of detail and sophistication that he attempted to misrepresent during the hearing.  The affidavit shows that he understood the nature of the prosecutor's offer to him:  he did not only hear through Mr. Cecutti's purported eruption that the prosecutor wanted him to cooperate.  Instead, he affirms that the prosecutor told him that she would provide him with a letter were he to cooperate.  Moreover, the affidavit shows that Mr. Griffin appreciated the legal issues implicated by the conversation:  he understood from the conversation the relevant sentencing guideline and the statute at issue.  The contradiction between Mr. Griffin's affidavit and his live testimony underscores the fact that he intentionally misrepresented his ability to speak English at the hearing to manufacture evidence in support of his Petition.

Mr. Griffin also acknowledged at times during his testimony that he was able to understand complex legal issues when they were described to him by Mr. Cecutti.  For example, he acknowledged that Mr. Cecutti explained the safety valve statute to him after he was convicted:  "Q:  Did you understand what the safety valve was at the time that you declined to take it?  A:  Yes.  Q:  How did you understand what it was?  A:  Anthony Cecutti explained it to me.  He told me that it would reduce my time and that I would be eligible to stay in the United States.  And I told him that my problem was not staying in the United States but why didn't he talk to me before I went to trial."  Tr. 82:11-19.  During the evidentiary hearing, Mr. Griffin simply could not keep straight his story that he was not able to understand what Mr. Cecutti said when he discussed legal issues, and that

Mr. Griffin theoretically could not communicate back to him in English.[6]  That is because Mr. Griffin was lying.

During the hearing, Mr. Griffin also lied about his inability to read English.  He expressly testified that "I don't know how to write in English."  Tr. at 43:11.  During the course of the hearing, Mr. Griffin's counsel had him read at length from a Spanish translation of the Plea Agreement:  Mr. Griffin read it without halting or hesitation.  From watching and listening to Mr. Griffin read, the Court can conclude that Mr. Griffin is very literate:  he reads very well.  And, unsurprisingly for a person who has been in the United States for nearly 30 years, his ability to read functioned in English as well.

To prove this point, the Government introduced evidence of text messages exchanged by Mr. Griffin with his co-defendant that were written in English.  Mr. Griffin wrote in English.  And, most tellingly, Mr. Griffin demonstrated that he could read English during the course of his testimony.  In one of the many slip-ups in his false testimony, when asked to review a document written in English, Mr. Griffin candidly reported "I don't see the word 'drugs' anywhere." Forgetting that he was supposed to be unable to read English, Mr. Griffin read an English-language document during the hearing and reported on what he read.  Mr. Griffin lied at the hearing regarding his asserted inability to read English language documents.

Mr. Griffin also provided false testimony regarding his willingness to accept responsibility for his crimes in order to accept a plea offer.  The Court has credited Mr. Cecutti's testimony that Mr. Griffin asserted consistently that he was innocent.  Mr. Cecutti's testimony is consistent with Mr. Griffin's statements to the Court at sentencing.  At sentencing, Mr. Griffin told the Court the

---

[6] One exchange is telling of Mr. Griffin's schismatic testimony on this topic:  "Q:  Well, Mr. Griffin, during those meetings, did you also speak or was it Mr. Cecutti who was speaking?  A:  I would answer him, but he was the only one who spoke.  Q:  Well, by answering him, weren't you speaking, Mr. Griffin?  A:  The few words I know to say.  Q:  And those words were in English, correct?  A:  Correct."  Tr. at 42:8-14.

following:

> Okay. Your Honor, I was innocent and found guilty by the jury.  I am not guilty.  According to what they presented to the jury, I have nothing to do with it.  If this was a two-year investigation, if in two years they were able to prove that I had a conversation with anyone or if I had ever had a meeting with any one of them or I ever gone into a building, then I would admit my guilt; but I am innocent.  I have to give up and recognize that I have nothing to do with what they are accusing me of.

> Let them prove -- let them do their job.  Let them prove it rather than hurting an innocent person.  Even when they came to my house to arrest me, I asked them, "What are you doing in my house?"  They told me it was because of the phone.  When they took me to the building where all the arrested people were, an officer asked me, "Don't you know any of them?"  Because they were all saying hello to each other.  I said, "No, I don't know these people."

> I told this to Anthony Cecutti, the lawyer who represented me before.  On the date I got out on bail he said, "If they don't know you and they don't mention you, you will get out of this problem," and I accepted his word for it since I was innocent and since I realized that I had nothing to do with it.  And the day that your Honor asked me whether I wanted to testify, I told you that I didn't. That was because I accepted the word of my attorney Anthony Cecutti. I was obeying him, but I should have testified on that day because that would have proven my innocence.

Dkt. No. 622 at 18:4-19:5.

These statements at sentencing—made before Mr. Griffin fabricated the factual basis for this *habeas* petition—were fully consistent with Mr. Cecutti's testimony regarding Mr. Griffin's position during the run-up to trial.  In them, Mr. Griffin asserted that he was innocent and that he wanted to prove his innocence at trial.

Mr. Griffin's testimony on this issue was undermined by the testimony of Ms. Rodriguez.  Ms. Rodriguez testified credibly that after Mr. Griffin was arrested, he told her—his partner of approximately 18 years and the mother of his children—that he was innocent.  She believed him.  Mr. Griffin never told Ms. Rodriguez that he wanted to accept responsibility for any crime, because he asserted that he was innocent.  Ms. Rodriguez sent a letter to the Court in connection with Mr. Griffin's sentencing in which she told the Court that she was in shock as a result of Mr. Griffin's charge.  She was still convinced at that time that Mr. Griffin was innocent.

Ms. Rodriguez's testimony is fully consistent with Mr. Cecutti's.  Her testimony supports the Court's conclusion that Mr. Griffin consistently maintained his innocence, from the time of his arrest until after trial.  And it belies Mr. Griffin's assertions that he was willing to accept a plea deal and cooperate if he had only been advised of the opportunity, and that he asked Mr. Cecutti for advice regarding a plea deal to no avail.

Mr. Griffin's failure to pursue relief under the safety valve statute following his conviction is also consistent with the Court's conclusion that he consistently maintained his innocence.  Even Mr. Griffin acknowledged during the hearing that he was fully advised by Mr. Cecutti regarding the availability of the safety valve as a means potentially to reduce his sentence below the mandatory minimum.  He did not do so, either while represented by Mr. Cecutti or by Mr. Neuman, the CJA lawyer who the Court appointed to replace Mr. Cecutti.  Had Mr. Griffin been willing to accept a plea deal following his conviction, as he asserted in his affidavit and during the evidentiary hearing, there would have been no reason for him not to seek safety valve relief prior to sentencing.  The fact that he did not do so supports the Court's conclusion that he continued to tell his counsel that he was innocent both before and after his conviction.

Mr. Griffin's account of the crime to which he was willing to plead guilty was shifting.  It evolved over the course of the hearing to deviate substantially from the facts he presented in his affidavit, and even the facts that he presented at an earlier stage of the hearing.  That is because his account was false.

Remember that in his affidavit, Mr. Griffin affirmed the following:

> Had Attorney Cecutti offered me any advice at all about the government's proposed cooperation/plea deal I would cooperated and pleaded guilty.  I was willing and able to cooperate in the manner proffered by the government.  But for Attorney Cecutti's absolute unwillingness to discuss the government's proffered cooperation/plea deal with me, I would have cooperated and pleaded guilty.

Griffin Aff. ¶ 5.  Mr. Griffin started off his testimony during the hearing in a manner consistent with

his affirmation.  His counsel showed him a Spanish language translation of the Plea Agreement, which had previously been provided to him.  He read parts of it out loud and stated that under its terms, he would be required accept a plea to a lesser offense.  (As described above, the lesser offense for which the Plea Agreement required him to accept responsibility was for conspiracy to distribute crack cocaine.)  At the hearing, while Mr. Griffin had the Spanish-language translation of the Plea Agreement in his hands, the following exchange between him and his counsel occurred:

> Q:  What action, if any, would you have taken if Mr. Cecutti had shown you this plea agreement before trial and reviewed its terms with you?
> A:  I would have accepted it.

Tr. at 20:5-12.

So Mr. Griffin started the hearing with unequivocal testimony that he would have accepted the plea offer by the Government.  That plea offer required that Mr. Griffin accept responsibility for trafficking cocaine.  That testimony was consistent with his affidavit.

What does not appear on the transcript, but was visible to the Court, and Mr. Griffin on the stand, was the reaction of Mr. Griffin's many supporters in the courtroom to Mr. Griffin's testimony at this point in the hearing.  Many shook their heads in response in what the Court took as disbelief in response to Mr. Griffin's testimony.  Mr. Griffin saw them.  After that point in the hearing, Mr. Griffin began to weave a new variant of his story.

In this version of events, Mr. Griffin testified, he never sold cocaine.  He no longer asserted that he would have pleaded guilty to selling cocaine:  he never sold cocaine to Mr. Perez or others. Tr. at 60:2-16.  Mr. Griffin walked back the basis for his assertion that he would have pleaded guilty to the offense offered in the Plea Agreement.  Instead, now Mr. Griffin testified that had given some pills to Mr. Perez that he "had found in a fridge."  Tr. at 59:25.  According to Mr. Griffin, he did not know what the pills were, but they might have been illegal drugs.  Tr. at 62:13-14 ("To tell you the truth, I don't know what they were, but I think I was told that they were Percocet.").

24

All of this testimony was incredible. Mr. Griffin did not merely give (note give, not sell) pills to Mr. Perez of an unknown type that he had "found in a fridge." This was a fabrication developed, the Court believes, during the course of Mr. Griffin's testimony. Like the Court, Mr. Griffin saw the incredulous reactions of his supporters in the courtroom to his confession that he would have pleaded guilty to a cocaine offense. That concession ran contrary to what he had told Ms. Rodriguez, and—the Court infers—told others who were close to him. So he changed his story.

But Mr. Griffin knew that for his Petition to be viable he had to accept responsibility for some crime in order to assert that he would have pleaded guilty if he had known about the plea agreement. A good reader, Mr. Griffin saw the reference in the Plea Agreement in his hand to the fact that the charged conspiracy included the sale of Percocet as well as crack. On the spot, Mr. Griffin developed his new account. In this version of events, although he was not guilty of selling crack cocaine, he could have admitted to giving Mr. Perez pills of unknown type that he happened to find in a refrigerator and that he had been "told" were Percocet. Testifying in front of his family and supporters, Mr. Griffin could not stick with the original story that he had presented to support his Petition and instead wove a new account that mitigated his culpability.

The shifting nature of Mr. Griffin's account showed that he was lying from the start. And if the Court did credit his testimony that he had only unknowingly given Percocet pills to Mr. Perez, Mr. Griffin could not have accepted the Government's actual plea offer, which required that he accept responsibility for conspiracy to distribute substantial quantities of crack, not a handful of indeterminate pills that he happened to find in a refrigerator.

Again, the Court has not attempted to inventory all of the evidence that supported the conclusion that Mr. Griffin's Petition was founded on falsehoods. But, as these points illustrate, Mr. Griffin's assertions that he was not informed of the Plea Agreement, and that he would have accepted a plea offer had he been so informed are not true. Instead, Mr. Griffin consistently

asserted his innocence and expressly refused to accept the plea offer that Mr. Cecutti adequately described to him.  He rejected the opportunities presented to him by Mr. Cecutti to resolve the case prior to trial, or to proffer for the benefit of the safety valve even after he was convicted.

## IV.   LEGAL STANDARD

"A prisoner in custody under sentence of a [federal court] claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  The Court "shall vacate and set the judgment aside" if the Court finds that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  *Id.* § 2255(b).  To respect the finality of criminal convictions, "a collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

It is well established that the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  In *Strickland v. Washington*, the Supreme Court set forth the familiar two-part test for determining whether an attorney's representation was ineffective.  466 U.S. 668 (1984).  First, the defendant must demonstrate that the representation "fell below an objective standard of reasonableness."  *Id.* at 688.  Second, the defendant must demonstrate that the deficient representation prejudiced the defendant.  *Id.* at 694.

Under the first prong of the *Strickland* test, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The court examines the reasonableness of counsel's actions, keeping in mind that "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

The prejudice component of the *Strickland* test asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gueits v. Kirkpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In order for a defendant to satisfy the second prong of the *Strickland* test, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94.

"'A defendant suffers a Sixth Amendment injury where his attorney fails to convey a plea offer' because '[d]efense counsel have a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government.'" *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010) (quoting *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003)). "As such, counsel's failure to convey a plea offer falls below an objective standard of reasonableness and thus satisfies Strickland's first prong." *Id.* "With respect to Strickland's second

prong, a defendant's statements that he would have accepted a plea offer 'in combination with' 'some objective evidence,' such as 'a significant sentencing disparity,' is sufficient to support a prejudice finding. *Id.*

"[A] finding of ineffective assistance requires a remedy specifically tailored to the constitutional error." *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000). That remedy is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *Id.* Where the error is a counsel's improper failure to convey a plea offer, the Second Circuit has described the proper remedy as "the resentencing, if any, to the terms appellant would have received had be been given proper legal advice." *Id.*

## V.   DISCUSSION

### A.   Mr. Cecutti Did Not Provide Ineffective Assistance to Mr. Griffin

The Court finds that Mr. Cecutti did not provide ineffective assistance on the grounds asserted by Mr. Griffin. The facts asserted by Mr. Griffin in support of his Petition are false. Mr. Cecutti exercised reasonable professional judgment. Mr. Cecutti conveyed the Government's single plea offer to Mr. Griffin. He reviewed its principal terms with Mr. Griffin and explained the consequences of a plea, as well as the consequences of a loss at trial. Mr. Griffin expressly rejected the plea offer. Mr. Griffin maintained his innocence with his counsel throughout the entire course of the representation, and, as described above, until after sentencing. Mr. Griffin asserted that he knew no facts that would support a potential cooperation deal.

Given those facts, Mr. Cecutti did not err. To the contrary, he capably discharged his professional responsibilities. Mr. Griffin rejected all opportunities to resolve the case short of trial because he consistently told his counsel that he was innocent, not because his counsel failed to explain his options to him or to convey the Government's plea offer.

### B.      There Would Be No Prejudice

The Court need not reach the issue of prejudice, but the Court observes that Mr. Griffin's most recent evolution of his story undermines the argument that he was prejudiced.  Mr. Griffin's most recent assertion is that he did not sell cocaine, but rather that he only gave some pills to Mr. Perez that he found in the fridge.  If the Court credited that version of events, Mr. Griffin could not have pleaded guilty to the only plea offer made by the Government:  the Plea Agreement required that he plead guilty to a conspiracy to distribute crack cocaine.  Mr. Griffin has stated again that he is not guilty of that crime.

There is no basis for the Court to conclude that there was a reasonable probability that the Government would have offered Mr. Griffin a completely different plea offer—one that would permit him to plead guilty to the distribution of Percocet tablets.  Such a deal was never on the table, leaving Mr. Griffin with nothing but speculation to support his claim of prejudice.  When he strayed from the facts asserted in his Petition and affidavit and developed his account of finding unknown pills in the fridge, Mr. Griffin likely did not know that he was undermining the basis for his claim of prejudice.  But he was.

### VI.      CONCLUSION

Mr. Griffin's Petition is founded on false statements.  Therefore, it is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  Mr. Griffin has not made a substantial showing of the denial of a constitutional right, so the Court denies a certificate of appealability under 28 U.S.C. § 2253.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 888 in *United States v. Junior Griffin*, 1:16-cr-656.  The Clerk of Court is further directed to enter judgment for the

Respondent and to close Mr. Griffin's civil action, *Griffin v. United States*, Case No. 1:21-cv-5822-

GHW.

      SO ORDERED.

Dated:  November 9, 2022
New York, New York

                             _____
                                 GREGORY H. WOODS
                               United States District Judge